**SO ORDERED.**

**SIGNED this 07 day of January, 2010.**



_____
**JANICE MILLER KARLIN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **BRYANT MANOR, LLC,** | ) | **Case No. 09-41958** |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Emergency Motion of Debtor, Bryant Manor, LLC to

use Cash Collateral, For Removal of Receiver, for an Accounting, and for Turnover of Real Property,

Cash Collateral and Books and Records,[1] as well as the Emergency Motion to Excuse Compliance

with Section 543(b) filed by CW Capital Asset Management LLC ("CW").[2]  CW filed the motion

in its capacity as Special Servicer for Bank of America, N.A. (Trustee), as Successor by Merger to

LaSalle Bank National Association as Trustee for the Registered Holders of J.P. Morgan Chase

---

[1]Doc. 3.

[2]Doc. 29.  Debtor questioned the Lender's standing at the evidentiary hearing.  CW demonstrated to the Court's satisfaction that the Lender is the owner and holder of the note and mortgage, and Debtor produced no evidence to rebut the evidence presented.  Further, Debtor consented to the Lender delegating service to a servicer or a trustee pursuant to ¶ 1.07 of the Promissory Note, Doc. 29-1.

Commercial Mortgage Securities Corp. (Lender). By virtue of 28 U.S.C. § 157(b)(2)(A), (E),(M), and (O), these are core proceedings over which this Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a).

## I.  FINDINGS OF FACT

Debtor, Bryant Manor, LLC ("Debtor"), is a Kansas limited liability company that operates a 100-unit apartment complex located in Kansas City, Kansas. On November 20, 2009, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor is a Debtor-in-Possession under 11 U.S.C. §§ 1107 and 1108,[3] and this case is a single asset real estate case as contemplated under § 101(51B).

Debtor does not dispute that Lender holds a perfected security interest encumbering most, if not all, of Debtor's assets, including Debtor's real property and any rents or leases from the real property. This security agreement arises out of a September 13, 2005 transaction in which Debtor executed and delivered a promissory note in the amount of $2,880,000 to ARCS Commercial Mortgage Co., L.P. ("ARCS"). To secure payment of that note, Debtor delivered to ARCS a Mortgage and Security Agreement granting ARCS a mortgage on the real property, a security interest in all of the Debtor's right, title, interest and possession in the real property, plus a security interest in all of Debtor's right, title and interest in and to all leases, licenses, tenancies, together with, among other things, the improvements, fixtures, equipment, accounts, rents, income, furniture, general intangibles and profits of the property.

---

[3]This bankruptcy was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101-1532 (2005), unless otherwise specifically noted.

Debtor also executed a separate Assignment of Leases and Rents, "further **securing** to Assignee the performance of the terms ... hereof and of the Note, the Mortgage, and each other document...."[4] Debtor assigned all its interests in any rents or leases to ARCS, subject to its ongoing use of the rents to operate the property and make payments on the note.[5] ARCS then transferred the note, mortgage and assignment of rents to Nomura Credit and Capital, Inc., which in turn transferred them to Bank of America, N.A. Although the Assignment incorporated admittedly strong language of an absolute nature, the Assignment was executed simultaneously with the mortgage documents, the mortgage indicated that the Assignment was incorporated into it, no independent consideration was given for the Assignment, the Assignment was effectively conditioned upon default (because Debtor could use the rents for any purpose until a default), the Assignment limited how the Assignee could use the rents (i.e., it could not distribute the money to its shareholders but had to be used in connection with the subject real property), the Assignment required Assignee to account to Debtor for the rents collected/received, and the Assignment terminated upon satisfaction of the debt.[6]

Although Debtor, a limited liability company, is the title owner of the property, a property management company located in Los Angeles, California, MKT Community Development, actually manages Debtor's day to day affairs. MKT Community Development is wholly owned by Bret Mosher, who is also the sole owner of Debtor.

---

[4]Exhibit C, Doc. 29-5 (emphasis added).

[5]Paragraph 1.11 of the Mortgage and Security Agreement at page 22, states that "until the occurrence of an Event of Default under this Mortgage," "Borrower shall have a license to collect and receive the Rents and Profits when due and prepayments thereof for not more than one month prior to due date thereof. Upon the occurrence of an Event of Default, Borrower's license shall automatically terminate without notice to Borrower and Lender may thereafter, without taking possession of the Property, collect the Rents and Profits itself or by an agent or receiver." Debtor does not dispute that an event of default (non-payment of the June 2009 note payment) had occurred almost five months prior to the date CW sought appointment of a receiver in state court.

[6]*Cf. In re Lyons*, 193 B.R. 637 (Bankr. D. Mass. 1996).

3

Debtor operated the property through its property management company as an apartment complex and remained current on its obligations to Lender until June 2009. In early 2009, Debtor contacted the loan servicer for Bank of America, CAPMARK, to discuss a possible loan modification, as it needed to reduce its monthly mortgage payments.

CAPMARK's employees informed Debtor that it could not seek modification of the terms of the mortgage with Bank of America's primary servicer; instead, it was told only Bank of America's special servicer, CW, had authority to make modifications. CAPMARK employees further told Debtor that CW would only be permitted to negotiate a loan modification if Debtor was in default. In other words, if Debtor wanted to renegotiate the terms of the loan through a loan modification, it would have to place itself in default.

As a result of that information, Debtor stopped making payments on the note in June 2009 so it would be declared in default and the servicing would be transferred to CW, in hopes CW would approve a loan modification. Although Debtor's representative testified that Debtor voluntarily stopped making payments in order to work on a loan modification, as CAPMARK had informed it was the only way to accomplish that result, he also admitted that a default was likely to occur soon thereafter, anyway, as Debtor did not have the funds to continue making the payments at the required level.

After Debtor defaulted on the loan, the servicing was transferred to CW, as promised, and Debtor began attempts to negotiate the loan modification. However, the terms offered by CW for a loan modification were completely out of the financial reach of Debtor, including the requirement

4

that Debtor infuse a very large sum of cash in order to obtain a temporary reduction in the monthly payments.[7]

When it became apparent that Debtor could not agree to the required cash infusion for the loan modification, Lender filed a foreclosure action, on October 20, 2009, in the District Court of Wyandotte County, Kansas.  In the foreclosure action, Lender sought and received the immediate appointment of a receiver via an *ex parte* order, which is expressly authorized by the Mortgage and Security Agreement signed by Debtor.[8]  On that same date, Ronald Nolan of Nolan Real Estate Services ("Nolan") was appointed receiver, posted a $25,000 receivership bond, and shortly thereafter took control of the property, including all incoming rents and certain books and records.  Nolan is an experienced court-appointed receiver of apartment complexes, including another apartment complex owned by Bret Mosher (or a corporation of which he is an owner).

Nolan has managed the apartment complex since its appointment.  According to the testimony presented and evidence received at the hearing, Nolan has asked CW for permission to fix several problems with the property, and has fixed others not requiring much cash, including cordoning off several balconies deemed unsafe, securing the area around a large sinkhole on the property to prevent children from playing around the area, purchasing fire extinguishers, instituting criminal background checks on potential tenants, and repairing, or arranging for the repair of, defects

---

[7]Uncontradicted testimony was that CW's modification offer required Debtor to infuse $180,000 to $200,000 cash, up front, in order to receive a $96,000 reduction in principal over 24 months.  Apparently the note payments were $20,000 a month, and Debtors were seeking a reduction to $4,000 a month for 24 months.

[8]Paragraph 3.1(d) of the mortgage also provides that "... Borrower does hereby irrevocably consent to such appointment [of a receiver], waives any and all notices of and defenses to such appointment and agrees not to oppose any application therefor by Lender ...."

5

in some portion of the exterior stucco walls of some units that have permitted water to penetrate.

The Court received conflicting testimony about the relative costs associated with Nolan operating the premises, including its receiver fee, as compared with the costs associated with having MKT operate the apartment complex. Although the evidence was far from clear on this point, the Court finds that CW established that Nolan is fully capable of operating the business for an amount at or below that level required by MKT, especially when including tasks such as marketing into the equation. In addition, CW established that Debtor had stopped making credit and criminal record checks in the recent past, presumably to increase occupancy rates, but that practice had lead to renting to a few unsavory tenants who, over the long term, would likely result in driving away "good" tenants. Further, the evidence about unsafe balconies, and failure to repair stucco walls leading to some units being unrentable, tended to show that Debtor's management company had been cutting corners, to the possible detriment of the tenants and to the value of the collateral securing Lender's note.

Shortly after filing the petition in this case, Debtor filed a motion for use of cash collateral (consisting of the rents), for removal of the receiver, for an accounting, and for turnover of the apartment complex and the personal property in connection therewith from Nolan to Debtor.[9] In that motion, Debtor admitted that the "highest probable value of the [real] Property is $800,000." A witness from CW testified that Debtor owes in excess of $3.28 million, and thus Lender's claim appears to be substantially undersecured. Debtor also admitted in its motion that "there is no alternative other than the use of the Cash Collateral to pay for the continuing operation of its rental

---

[9]Doc. 3.

6

property."[10]  Finally, CW's employee testified that it will advance money to the receiver for necessary repairs, but will not do the same for Debtor.

CW filed an objection to Debtor's motion,[11] and also filed a motion to excuse compliance with § 543(b).[12]  The substance of this motion is to seek retention of Nolan as a receiver over the complex.  CW has also filed a motion to dismiss,[13] which has not yet been heard.

The Court will address additional findings of fact below, if necessary.

## II.  ANALYSIS

### A.  Post-petition rents are property of the bankruptcy estate.

The starting point in analyzing both motions under review is CW's contention that the appointment of the receiver in the state court foreclosure action completely divested Debtor of any right, title or interest in the rents from the property, and immediately vested complete title in those rents in Lender.  The ultimate legal issue is, therefore, whether the assigned rents are properly classified as property of the estate under § 541(a)(1), which would be the case if the assignment merely pledged the rents as security for repayment of the debt.

#### 1.  Kansas law did not operate to divest Debtor of all interest in the rents upon the appointment of the receiver.

Property of the estate consists of all property in which the debtor holds an interest upon the commencement of bankruptcy.[14]  Generally, a debtor-in-possession, as trustee, is free to use, sell or

---

[10]*Id.* at ¶ 6.

[11]Doc. 28.

[12]Doc. 27.

[13]Doc. 29.

[14]Section 541(a)(6).

7

lease property of the bankruptcy estate in the operation of the debtor's business.[15]    Thus,

classification of the rents is significant because if estate property, the rents could potentially fund the

Debtor's reorganization.   Applying those principles to this case, a ruling in favor of CW on that

critical issue would essentially render moot Debtor's motion to use cash collateral, since, as will be

discussed in more detail below, the property in question would not then constitute property of the

estate, or cash collateral.[16]

Debtor relies on *In re Barkley 3A Investors, Ltd*,[17] a 1994 decision by Judge Flannagan under

relatively similar facts.  The lender claimed a perfected security interest both in debtor's (hereinafter

Barkley) office building and in the rents generated thereby as a result of a mortgage and a separate

assignment of rents.  The lender claimed that post-petition rents constituted cash collateral under

§ 363, and Barkley contended that either they did not, or if they did, that lender was adequately

protected or its security interest in the rents should be avoided by the equities of the case.

Judge Flannagan noted that with the exception of the adequate protection issue, the issues

depended primarily upon state law for resolution, and provided a thorough analysis of state law.  He

noted that under Kansas law, an assignment of rents to secure payment of a mortgage debt is deemed

part of the mortgage, and is enforceable only in accordance with the law relating to foreclosure of

---

[15]Sections 1107(a) and 363(c)(1).

[16]*In re 5877 Poplar, L.P.*, 268 B.R. 140, 145 (Bankr. W.D. Tenn. 2001) and *In re Kingsport Ventures, L.P.*, 251 B.R. 841, 846-47 (Bankr. E.D. Tenn. 2000) (both noting that for a debtor's property, such as rents or profits, to constitute cash collateral under § 363(a), the property also must qualify as property of the estate because, under § 363(c)(2), cash collateral includes only property in which the estate and an entity other than the estate have an interest).

[17]175 B.R. 755 (Bankr. D. Kan. 1994).

8

mortgages.[18]  He also noted that with the "passage of the Bankruptcy Reform Act of 1994, such inquiries into state law may decrease" because Congress added § 552(b)(2), dealing with post-petition rents, effective October 22, 1994.   Under that section, a creditor holding a security agreement that by its terms extends to pre- and post-petition rents will have a security interest in post-petition rents that are cash collateral; the section specifically omits reference to "applicable nonbankruptcy law."

CW relies on language in a 1932 Kansas Supreme Court decision, *Hall v. Goldsworthy*,[19] for the proposition that Debtor lost all right, title and interest in the apartment complex's rents after the *ex parte* appointment of the receiver on October 20, 2009, and that therefore, rents coming into existence post-petition are not property of Debtor's bankruptcy estate.   In *Goldsworthy*, the lender sought to foreclose a deed of trust that contained an assignment of rents provision.   Recognizing Kansas' position as a "lien theory" state in which a mortgage or similar conveyance grants only a security interest to a lender rather than actual title to the property being conveyed, the Kansas Supreme Court found that although the assignment was valid, all it conveyed to the lender was a security interest in the rents. The court went on to hold, however, that:

> Reason and authority lead us to the conclusion that the mortgagee is not entitled to the benefits of the contract for the rents and profits of the land until he has, by appropriate proceedings through the courts, taken the possession and control of such rents and profits. An appropriate remedy is through a receiver.  It, however, does not necessarily follow that this is the only remedy.  **Any proper procedure which would empower the court to control the rents and profits would be**

---

[18]*Id.* at 761, (citing *In re Stanley Stations Associates, L.P.*, 139 B.R. 990 (Bankr. D. Kan. 1992) (noting that in Kansas, mortgage rents issues are controlled by real estate law, not the Uniform Commercial Code.))

[19]136 Kan. 247 (1932).

**sufficient to vest the mortgagee with the title thereto**, which must, of course, be applied on the mortgage indebtedness.[20]

Based upon this language, in a case having no relationship to bankruptcy law, Lender argues that since it had obtained the *ex parte* appointment of a receiver before Debtor filed its petition, it, and not Debtor, is now the title owner of all rents.

Several courts have cited *Goldsworthy* for the proposition that title to rents vest in a mortgagee upon the appointment of a receiver. For example, in *Hoelting Enterprises v. Trailridge Investors, L.P.*,[21] the Kansas Court of Appeals stated that because Kansas is a "lien theory" jurisdiction rather than a "title theory" jurisdiction:

> Under Kansas law, a mortgage is not a conveyance of an interest in land. The mortgagee acquires no estate whatever in the property, either before or after condition broken, but acquires only a lien securing the indebtedness described in the instrument. In a "title theory" jurisdiction, on the other hand, the mortgage is viewed as a form of title to property. In lien theory states, a mortgagee is not entitled to immediate possession of the property upon default because the mortgage is merely a lien and not a form of title.
>
> Under Kansas law, therefore, a purely executory agreement alone is not effective to vest in a mortgagee **the right to rents and profits**. **The right to rents and profits** may vest in a mortgagee, however, if (1) the mortgagor defaults and the court appoints a receiver, or (2) the mortgage assigns the rents and the mortgagee reduces the rents to his possession by proper legal action. Proper legal action that may vest in a mortgagee **the right to rents and profits** pursuant to such an assignment includes a court's appointment of a receiver, and a mortgagor's voluntary consent to the mortgagee obtaining possession of the rents.[22]

Similarly, in *In re Winston XXIV Ltd. Partnership*,[23] the District Court in Kansas heard an appeal from the Kansas Bankruptcy Court regarding what steps are necessary to perfect a security interest

---

[20]*Id*. at 252 (emphasis added).

[21]17 Kan. App. 2d 777 (1993).

[22]*Id*. at 782-83 (internal quotations and citations omitted) (emphasis added).

[23]147 B.R. 575 (D. Kan. 1992).

10

in rents.  Although not directly addressing the issue before this court, the District Court did address

the *Goldsworthy* decision, noting that:

> Although the assignment creates a lien or security interest in favor of the assignee just as a mortgage creates a lien on behalf of the mortgagee, under Kansas caselaw the assignee is "entitled to the benefit of the contract" only after he takes action in court to reduce the rents to his possession or control.  Any proper procedure which would empower the court to control the rents and profits would be sufficient to vest the mortgagee with the title thereto ..., including appointment of a receiver.  **While the assignee must take court action or the equivalent to obtain *title* to the rents, thereby divesting the assignor of his entire interest therein**, the court is unaware of any Kansas case that requires the assignee to take court action in order to perfect a security interest in rents.[24]

The Court is certainly mindful of the language used by the Kansas Supreme Court in

*Goldsworthy* and the cases that have cited it.  However, the Court is also mindful that the context

of each of those cases was vastly different than the one currently before the Court.  None of those

cases dealt with the issue that is before this Court —whether a debtor retains a legal or equitable

interest in rents following a valid assignment and the appointment of a receiver.  Taking the language

used by *Goldsworthy* out of the context of that case and applying it to a somewhat related, but

significantly different legal issue, is problematic.  Although the Court must assume the Kansas

Supreme Court intended its word choice when it rendered the *Goldsworthy* decision, it is also

mindful that the court was not deciding the issue currently before this court, and very well may have

chosen different language had that been the case.

CW urges the Court to find that the appointment of the receiver terminated Debtor's interest

in the rents, and that full and complete title vested in Lender at that point.  The Court disagrees with

CW's position.  First, as even CW admitted at the hearing on this matter, there is no question that

---

[24]*Id.* at 579-80 (bold emphasis added, italicized emphasis in original).

Debtor would be entitled to all future rents once the mortgage is paid. So, at a minimum, Debtor retains a reversionary interest in the rents.[25]

Second, Kansas courts have made it clear that debtors always retain an interest in, and control over, rents during the redemption period following a foreclosure action.[26] Although not directly applicable here, because Debtor apparently waived any redemption rights, the point is that the appointment of a receiver in a case where there has been an assignment of rents does not terminate the debtor's interest, and certainly does not automatically create an absolute transfer of all interests to the lien holder.[27]

Finally, the Court finds it important to note that even after Lender purportedly obtained "title" to the rents, Lender does not gain complete control over the rents to use as it wishes pursuant to the terms of the parties' contracts. Instead, any profits from the rents, after paying ongoing business expenses related to the property, must be used to pay down the debt owed by Debtor. Were this a

---

[25] *See also In re Guardian Realty Group, LLC*, 205 B.R. 1, 5 (Bankr. D. Colo. 1997) (holding that court must look at substance of entire agreement, not just isolated portions of the mortgage language that may appear absolute, and citing *In re Bethesda Air Rights Limited Partnership, 117 B.R. 202, 207* (Bankr. D. Md. 1990) for the proposition that "As long as the mortgagor is entitled to the rents upon paying the mortgage debt, a security interest has been given, not a transfer of ownership."), and *In re Foundry of Barrington P'ship*, 129 B.R. 550, 557 (Bankr. N.D. Ill.1991) (noting that "[the lender] can call this arrangement an 'absolute assignment' or, more appropriately, 'Mickey Mouse.' It's still a lien....").

[26] *Mid Kansas Federal Sav. and Loan Ass'n of Wichita v. Zimmer,* 12 Kan. App. 2d 735, 737 (1988).

[27] *Cf. Home Owners' Loan Corp. v. Benner*, 150 Kan. 108, 112 (1939) (holding that "[i]n examining these interesting cases with their diverse procedural shadings, we find none which excels our own decisions in their solicitude that no unfair advantage be taken of the mortgage debtor, nor any which guards with greater zeal his unassailable right to the rents and profits of the property during the redemption period following its sale in foreclosure."); *Mid Kansas Federal Sav. and Loan Ass'n of Wichita v. Zimmer,* 12 Kan. App. 2d at 737 (noting that while a receiver may rent, control and manage premises during redemption, the income (except as needed for repairs, etc.) shall go to the person who otherwise would be entitled to possession during the period of redemption). This holding would make no sense if the owner had lost all right, title and interest to the rents upon the initial appointment of the receiver.

true, absolute assignment of all Debtor's interest, Lender could use the rents in any fashion, as it would if it truly held 100% ownership interest in all future rents.[28]

Kansas appellate court decisions since *Goldsworthy* also appear to clarify what the lender is entitled to receive in these cases. For instance, in *Hoelting Enterprises v. Trailridge Investors, L.P.*,[29] the Kansas Court of Appeals held that "[w]e are convinced and so hold that a mortgagee's right to receive rents and profits validly assigned to it vests when the mortgagee initiates proper legal action to enforce its right."[30] Unlike the language used in *Goldsworthy*, this language appears to more accurately describe that it is the right to receive and control the rents that vests in the lender, not absolute title. Given the opportunity to review the law in light of the situation currently before this Court, the Court is certain that the Kansas Supreme Court would clarify that it is the right to receive and control the rents while a receiver is in place that vests in a lender, not absolute title to all future rents.

The Court further agrees with Debtor when it argues that it retained its ownership interest in rents and profits notwithstanding its assignment of rents and notwithstanding the appointment of the receiver, which rights can be enforced once the receiver is removed, if it is. The appointment of a receiver is the mechanism a secured lender in Kansas may use to enforce lien rights in rents, not a mechanism for divesting debtor of all right, title and interest in the rents and vesting that ownership

---

[28]The court in *In re Amaravathi Ltd. Partnership*, 416 B.R. 618, 635 (Bankr. S.D. Tex. 2009) makes an interesting point that "a pro tanto payment must be made to create a 'true' assignment. A pro tanto payment is a credit to the debt of the present value of the future rental stream. Thus, if the future rental stream was worth $10,000,000 at the time the loan documents were executed, [lender] was required to reduce the debt by $10,000,000 in order to effect a 'true' assignment of title. No pro tanto payment occurred in this case. [Lender's] Trust's failure to credit the present value of the rents is an indication that the parties did not treat the assignment as one of both a legal and an equitable interest." (Internal citations omitted).

[29]17 Kan. App. 2d 777 (1993).

[30]*Id.* at 785.

13

interest forever in a mortgagee, here Lender. Once Debtor is restored to possession of the real estate and the right to collect rents and profits, the mortgagee still has whatever lien rights it had under pre-petition law.

### 2. Federal bankruptcy law also brings the rents into the bankruptcy estate.

Although the Court has held that under Kansas law, Debtor retained a sufficient ownership interest in the rents generated from the real estate to bring those post-petition rents into the bankruptcy estate, as property of the estate, the Court also finds that even were it to hold in favor of Lender on this issue, §541(a)(6) requires the inclusion of the rents in the bankruptcy estate as a matter of federal law.

This issue was recently discussed in great detail in *In re Amaravathi Ltd. Partnership.*[31] In *Amaravathi*, the court was faced with the precise issue this Court faces. The court noted that "[t]he Supreme Court [in *Butner*] has held that bankruptcy courts should generally look to state law to determine property rights in the assets of a bankruptcy estate."[32] There are, however, two exceptions to this general rule, including: (1) if Congress modifies state law through legislation enacted under Congress' authority to establish uniform bankruptcy laws under the United States Constitution, and (2) if some federal interest requires a different result.[33]

As is true in in this case and in *Amaravathi*, *Butner* dealt with a dispute between a bankruptcy trustee (in this case a debtor-in-possession) and a mortgagee over the right to rents collected by a bankruptcy estate. All three cases involve the same fundamental legal question: how to determine

---

[31] 416 B.R. 618 (Bankr. S.D. Tex. 2009).

[32] *Id.* at 622 (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)).

[33] *Butner*, 440 U.S. at 54-55.

14

property rights in rents received from a rental property after the owner of the rental property has filed a bankruptcy petition. As noted in *Amaravathi*, the Supreme Court in *Butner* found that neither of the two exceptions set forth above applied, and the Court then held that property rights in post-petition rents should thus be determined by looking to state law.[34] *Amaravathi* further noted, however, that the Supreme Court left no doubt that federal bankruptcy law would override state law if Congress were to enact a statute defining the rights to post-petition rents, when it stated that:

> The Constitutional authority of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States" would clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankrupt estate. But Congress has not chosen to exercise its power to fashion any such rule.[35]

It is important to note that *Butner* was decided on February 21, 1979. At that time, the Bankruptcy Act of 1898 was still in effect and had not yet been replaced by the Bankruptcy Code. The Bankruptcy Code did not become effective until October 1, 1979, more than seven months after the *Butner* decision. The importance of the timing of *Butner* was addressed by the *Amaravathi* court; it noted that "[u]nlike the Bankruptcy Act, the Bankruptcy Code unambiguously defines the interests in the rents and profits earned by property in a bankrupt estate."[36] *Butner's* invitation to Congress to define such interests was accepted by the passage of § 541(a)(6), which clearly states that the "proceeds, product, offspring, rents, or profits of or from property of the estate" are considered property of the bankruptcy estate.[37]

---

[34]*Id.*

[35]*Id.* at 54

[36]*Amaravathi*, 416 B.R. at 623.

[37]*Id.*

There is no question that the real estate in this case is property of the bankruptcy estate. CW does not contest this fact. Therefore, under the clear, unambiguous language of §541(a)(6), any rents derived from that property also constitute property of the bankruptcy estate as a matter of federal bankruptcy law. Contrary to the holding of *Butner*, which was decided prior to the enactment of §541(a)(6), there is no need to turn to state law for resolution of this issue. Congress, in enacting §541(a)(6), defined the treatment of rents in this case, and that statute brings post-petition rents into the bankruptcy estate, effectively preempting any state law that might provide for different treatment. Thus, even if the Court had found that Kansas law transferred complete legal title to the rents to CW, §541(a)(6) would still operate to bring those rents into the bankruptcy estate.

And as the Court explained in *Amaravathi*, this statutory scheme makes sense in light of the twin goals of bankruptcy, which are (1) permitting the debtor to obtain a fresh start, and (2) ensuring that claims are paid. "Congress likely recognized that the better policy is to allow the estate to use the rents to reorganize while adequately protecting the interest of the mortgagee in the rents."[38] A contrary decision would effectively deny Chapter 11 relief to any debtor who is dependent on rents, such as hotels, apartment complexes, shopping centers, office buildings, senior residence facilities, and the like.

**B.      CW and Nolan are, at least for now, excused from the turnover requirements of § 543(b).**

Even though this Court finds that post-petition rents do constitute property of the estate, the evidence presented by CW justifies granting CW's Motion to excuse compliance with § 543(d), at least for the time being. Section 543(b) requires, *inter alia*, any custodian that has possession of

---

[38]*Id.* at 626.

estate property at the time of filing to return that property to the trustee (or debtor in possession acting as a trustee) and to provide an accounting. However, §543(d) provides, in pertinent part, that

> After notice and hearing, the bankruptcy court—
>
> > (1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property….

"Turnover is the general rule, however, and excuse from compliance is the exception. Therefore, a party opposing turnover must demonstrate affirmatively how creditors will be better served if the receiver is retained."[39] A request for excuse from turnover requires the Court to examine (1) the debtor's likelihood of reorganization; (2) the probability that funds required for reorganization will be available; and (3) whether the evidence shows mismanagement of the property by the debtor.[40]

The Court first notes that the presumption favoring turnover of estate property is lessened, at least to some degree, by the fact that Debtor does not seek the return of its property so that it can operate and manage its property. Debtor does not control the day-to-day operations of the business; those responsibilities are placed in the hands of a related management company, MKT. Although there is certainly nothing inappropriate in the relationship with Debtor and MKT, the Court does find it relevant that what Debtor is essentially asking the Court is to allow Debtor's third-party management company to replace the third party (the receiver) that is currently managing the property. Although there is nothing wrong with that request, the Court does find that the fact that Debtor itself is not looking to operate and manage its business affairs in the course of this Chapter

---

[39] *In re Poplar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989).

[40] *Id.*

11 proceeding reduces, at least a bit, the presumption that the property should be returned from the custodian to the Debtor under § 543(a).[41]

Evidence presented at trial in this case also establishes that it would be in the best interest of creditors to allow Nolan to continue managing the property, at this time. First, CW has raised serious issues as to the likelihood of a reorganization in this case through its motion to dismiss, which has not yet been heard. CW contends that because it holds over a $2.2 million undersecured claim, that it will control the vote in its class of claims, and that it will not agree to impairment under any potential Chapter 11 plan. Because of that, according to CW, Debtor would not be able to propose a confirmable plan. Although whether Debtor can obtain plan confirmation is not before the Court, and the Court is in no way passing judgment on the merits of the motion to dismiss or the possibilities of a confirmable plan, serious questions have been raised about whether a reorganization is possible in this case.

Second, the Court has concerns whether there will be funds available for reorganization if Debtor regains control over the property. The evidence established that Debtors had not made any payment on the mortgage debt for at least a five month period (which would total $100,000 "saved"), yet still managed to accumulate over $24,000 in past-due utilities that the receiver had to pay to prevent utilities from being terminated at the point the receiver took possession. In other words, in the five months leading up to the filing of the bankruptcy petition, Debtor not only failed to hold in reserve the approximately $20,000 a month it was not paying to CW on the mortgage debt, but also

---

[41] The Court notes, however, that even under the stronger presumption, its holding in this case would not change. In addition, although Debtor theoretically has a larger incentive to make a profit and reduce costs, that is a two-edged sword when that incentive results in electing not to perform required maintenance, to not timely pay for ongoing utilities, etc. Further, Nolan has a fiduciary duty to the state court, and now to this Court, to make prudent business decisions in managing the complex, and the Court assumes it will do so.

18

failed to maintain the ongoing utility payments for the property.  This is also true regarding real property insurance.  Failure to pay the mortgage payment, which includes a reserve for taxes and real property insurance, means the escrow fund for these purposes has not been fully funded at a time when Debtor's "budget" shows it was collecting rents from 80 units.[42]

Third, the fact that there appears to be deferred maintenance and upkeep issues on the property prior to the appointment of the receiver also raises questions as to the funds available for Debtor to do necessary maintenance and repairs.  CW has pledged to loan to the receiver the money necessary to make repairs and perform maintenance, but declines to accord the same treatment to Debtor.  This raises serious concerns whether Debtor will be able to maintain the value of the complex, and whether it will be able to generate sufficient funds for a reorganization.  Even when it was receiving rents, it was not making these repairs, which Nolan testified could cost upwards of $300,000 to complete.  Because the creditor is entitled to have the real property properly maintained, so the value of its security interest is not diminished by failure to perform routine maintenance (which here has clearly been deferred by the owner/Debtor), retention of the receiver is appropriate.

Fourth, the Court finds that there was some mismanagement of the property by the Debtor, or its management company, and that Nolan has been a more effective property manager, at least in the early stages of its appointment.[43]  The evidence presented at trial that supports this conclusion includes:

    1.    Debtor was not current on the ongoing utility payments, and Nolan had to pay the past due amounts to prevent shutoff;

---

[42] The Court takes judicial notice that Nolan has recently filed a motion to borrow in excess of $49,000 to pay real property taxes it claims are now due and payable.  *See* Doc.56.

[43] Whether it will continue to be the most cost-effective manager remains to be seen.

19

2.    When Nolan did a unit-by-unit inventory of the premises on or about October 20, 2009, it discovered that only 66 of the units were actually occupied, as compared to the 80 units that Debtor believed to be occupied. Why 34, or even 20, of the units were allowed to remain unoccupied is a concern;

3.    At some point prior to filing bankruptcy, Debtor had instructed its local property managers to stop performing credit checks and criminal background checks on potential tenants prior to renting to them. Nolan found that of the occupied units, four units had renters that had no visible means of support, and six units had individuals with criminal backgrounds that made them unsuitable as tenants in this property, including one who is a registered sex offender. Nolan testified it is common practice in Kansas City to perform these background checks, which testimony was not contradicted, and Debtor's decision to stop them concerns the Court;

4.    There were no fire extinguishers located on the property. Nolan testified that as of the hearing date, extinguishers had been ordered and were on their way to the property;

5.    There were several occurrences of deferred maintenance on the exterior finish of the walls. The failure to stay on top of routine maintenance had allowed water to penetrate the walls, causing water damage and potential mold issues, in some of the units;

6.    There were ten to twelve vacant units that needed repairs before they could be rented, including four units with water damage/mold issues and seven units missing at least some of the appliances;

7.    Some of the balconies on the property had rotting wood joists that created a safety hazard for the residents and visitors to the property. At the time of the hearing, Nolan was still working on correcting the issues, but had cordoned off the balconies so that no one could enter them and be injured;

8.    There was a deep sink hole on the property that posed a hazard to the residents, especially the small children who live in the complex. Nolan took steps to secure the area around the sink hole and prevent anyone from walking or playing near it;

10.   Nolan will be able to arrange for cheaper marketing with vendors with whom Nolan has good reputation and can purchase marketing packages in greater volume, providing a benefit to the estate;

11.   Debtor has failed to maintain an account containing the security deposits paid by renters when they move in. In the event a renter moves out and is entitled to a refund

20

of his or her security deposit, that money is not readily available in a separate account, but must come out of operating revenue.

The Court also notes that other evidence presented at trial shows that leaving Nolan in place is likely in the best interest of the creditors, again, at least for now. First, Debtor's own witness testified that Nolan is capable of managing the property just as effectively as the management company that was in place prior to Nolan (owned by the owner of Debtor). In addition, Nolan has retained all of the local employees who were managing the day-to-day operations of the property prior to the filing of the bankruptcy, so there would be continuity in the day-to-day management of the property if Nolan is left in place.[44] Finally, the Court finds the evidence presented established that Nolan could operate the property for the same, or less, amount of money than Debtor was spending while MKT was operating the property—especially when items such as marketing and bookkeeping are included in the equation, even when considering that MKT does not intend to charge a fee.

Based upon the evidence presented to date, the Court finds that CW should be excused from the turnover requirements of §543(b). At this time, the Court finds it is in the best interest of the creditors to retain Nolan to operate this apartment complex. The Court will be willing to revisit this issue in the future if Debtor can show new evidence or a change in circumstances demonstrating that it would no longer be in the best interest of the creditors for Nolan to remain in place as the receiver.

**C.      Debtor's motion for use of cash collateral is moot.**

---

[44]At a recent hearing, Debtor's counsel indicated one employee might be soon terminated by Nolan, and asked the Court to require Nolan to retain that employee. The Court declined to micro-manage this apartment complex, but that argument indicates that one of the employees may no longer be employed by Nolan.

21

The final issue before the Court is Debtor's motion for use of cash collateral. Debtor seeks to use the rents, which it contends constitute cash collateral, to fund the ongoing operation of the business. CW has objected to this request on several grounds, including an argument that the rents are not cash collateral because the Debtor has no interest in the rents (which position this Court has now rejected), and that Debtor has not offered adequate protection.

The Court has previously found that Debtor does have an interest in the rents, as does Lender, and therefore the rents do constitute cash collateral. However, the Court's finding that Nolan can remain in place as a receiver in this case essentially renders the motion to use the cash collateral moot. The Court has already determined that Nolan will continue to collect the rents and use them to fund the ongoing operation and necessary maintenance and upkeep on the property. Because it is Nolan, and not Debtor, that is entitled to collect the rents and fund the operation of the business, the Court must deny Debtor's request to use the rents to manage the property, as moot.

## III. CONCLUSION

Based upon the analysis provided above, the Court finds that Debtor has retained an interest in the post-petition rents produced from the real estate, and that those rents are property of the bankruptcy estate. However, the Court finds that the interest of the creditors in this case are best served, at least at this time, by allowing Nolan to remain as receiver of the property and to collect the rents and continue managing the property. Based upon the finding that Nolan should remain in place, the Court finds that Debtor's motion for use of cash collateral is moot, as Debtor has no need to use the rents at this time.

22

**IT IS, THEREFORE, BY THE COURT ORDERED** that the Emergency Motion to Excuse Compliance with Section 543(b) filed by CW Capital Asset Management LLC ("CW")[45] is granted.

**IT IS FURTHER ORDERED** that the Emergency Motion of Debtor, Bryant Manor, LLC to use Cash Collateral, For Removal of Receiver, for an Accounting, and for Turnover of Real Property, Cash Collateral and Books and Records[46] is denied, without prejudice to refiling in the event of newly discovered evidence or a material change in the facts of this case, including but not limited to more concrete evidence that Debtor could comparably operate the complex at a cost to the estate less than Nolan has or will charge, and that management has addressed the problems with prior management decisions addressed in this decision.

# # #

---

[45]Doc. 29.

[46]Doc. 3.